IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 8, 2015

## QUENTIN ELLIOTT LAWRENCE v. JESSICA MARCEL BROADNAX

**Appeal from the Circuit Court for Hamilton County**
**No. 110698     Hon. W. Neil Thomas, III, Judge**

_____

**No. E2015-00214-COA-R3-CV-FILED-JULY 31, 2015**

_____

This post-divorce appeal concerns the mother's notice of intent to relocate with the parties' minor child. The father responded by filing a petition in opposition to the requested relocation. Following a hearing, the trial court granted the father's petition. The mother appeals. We reverse the order of the trial court and remand for further proceedings regarding the best interest of the minor child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Charles G. Wright, Jr., Chattanooga, Tennessee, for the appellant, Jessica Marcel Broadnax.

Jillyn O'Shaughnessy, Chattanooga, Tennessee, for the appellee, Quentin Elliott Lawrence.

**OPINION**

## I.     BACKGROUND

Jessica Marcel Broadnax ("Mother") and Quentin Elliott Lawrence ("Father") were married in December 2004. One child ("the Child") was born of the marriage in August 2009. Mother and Father (collectively "Parents") were divorced by final decree in April 2012. The divorce decree incorporated a parenting plan in which Mother was designated as the primary residential parent of the Child, while Father was awarded 104 days of co-parenting time.

On October 14, 2014, Mother provided Father with a notice of intent to relocate to Philadelphia, Pennsylvania, citing a possible employment opportunity as the reason for the relocation. She later amended her notice to include Trenton, New Jersey, as another possible place of relocation due to a different employment opportunity. Father responded by filing a petition in opposition to the requested relocation, asserting that the relocation was not in the Child's best interest when his extended family lived in Chattanooga. He asserted that Mother's work history was unstable and claimed that he feared for the Child's safety if the relocation were approved. Mother responded by asserting that her proposed relocation was in the best interest of the Child given the employment opportunity. She also noted that she had family outside of the Chattanooga area. Father filed an amended petition in which he asserted that the proposed relocation was not for a reasonable purpose, was proposed in a vindictive manner, and would cause irreparable harm to the Child. He stated that the Child relied upon him and his family in the area for emotional support, nurturing, and development. He claimed that the relocation was also not in the Child's best interest. He filed a proposed parenting plan, requesting his designation as the primary residential parent. Mother denied Father's allegations and filed a proposed parenting plan that provided him with 100 days of co-parenting time.

At the trial, held on December 16, 2014, Mother testified that she has lived in Chattanooga, Tennessee, since the time of the divorce in April 2012. She related that she allowed Father to exercise co-parenting time at his convenience because he lived in Georgia at the time of the divorce. She acknowledged that Father's co-parenting time increased when he relocated to Chattanooga. She currently allows him to exercise co-parenting time every other weekend from Friday night to Monday morning. She claimed that Father failed to maintain health insurance for the Child as agreed.

Mother testified that she obtained an undergraduate degree from Austin Peay State University and a master's degree in education from the University of Texas, Arlington. She provided a brief employment history, starting with her employment as a family literacy coordinator for the Dallas Independent School District in Dallas, Texas, with an annual salary of approximately $45,000. Following the divorce in April 2012 and her move to Chattanooga, Tennessee, she worked as a financial counselor with an annual salary of approximately $50,000. She later worked for the Chattanooga Girls Leadership Academy as a special education teacher with an annual salary of approximately $43,000, then for the City of Chattanooga with their online literacy program with a salary of approximately $20 per hour, and then for the Chattanooga Public Library with an annual salary of approximately $50,000.

Mother testified that she immediately began searching for new employment when her employment with the library ended in August 2014. She initially looked for employment in Tennessee and Georgia in the area of education. She submitted five or six

applications but was not granted an interview for any of the positions. She broadened her employment search to include New Jersey, Philadelphia, and New York after her efforts were unsuccessful in Tennessee and Georgia. She sent approximately 40 applications for positions with an annual salary of $55,000 or more. She later received two invitations for an interview, one in Philadelphia and one in New Jersey with Scholar Academies, which operated schools in Philadelphia, Washington, D.C., and Trenton, New Jersey. She did not receive an offer from the employer in Philadelphia, but she was still in contact with Scholar Academies for a teaching position with an approximate annual salary of $55,000 or more in Trenton, New Jersey.

Mother testified that she would provide Father with co-parenting time in accordance with the Child's school schedule if her proposed relocation were approved. She noted that they could easily exchange the Child in North Carolina. She had enrolled the Child in Faith Christian School because she was unfamiliar with the school lottery system in New Jersey. She planned to revisit his school placement once she had time to research the school systems.

Mother admitted that she only pursued employment opportunities in Tennessee that provided an annual salary of $50,000 or more. She abandoned her search because she believed she could not obtain her desired salary in the Chattanooga area. She agreed that the cost of living was higher in New Jersey than in Chattanooga. She stated that a comparable rental residence would cost $1,000 per month as opposed to her current rent of $725 per month. She acknowledged that the Child currently attended school for free. She estimated that his tuition in New Jersey would cost in excess of $500 per month.

Mother admitted that the majority of her family and Father's family lived in Chattanooga. Relative to other family members, the following colloquy occurred:

Q.     And let me ask you about that. You don't include any reasons such as family in your letters for your move to Trenton, New Jersey or Philadelphia.

A.     I have family surrounding New Jersey.

Q.     You don't include that in your letters?

A.     I don't need to.

Q.     I'm asking you a question. Did you include that you have family in the surrounding areas of Trenton, New Jersey?

A. It didn't require me to.

Q. So you did not include –

A. No.

Q. When is the last time you visited any of that family that's in surrounding New Jersey?

A. I went to New Jersey – I have family in Pittsburgh, Pennsylvania; I have family in Massachusetts; I have family in North Carolina. And it's irrelevant how often I visit my family.

Q. Please answer the question. When is the last time –

A. I can't recall.

Q. Have you visited them since [the Child] was born?

A. I can't recall.

Mother admitted that the Child enjoyed a loving relationship with her family in Chattanooga and that he visited with them on a weekly basis.

Father testified that he moved to Chattanooga a few years after the divorce to be closer to the Child and his extended family, including his mother, grandmother, sister, several aunts and uncles, and numerous cousins. He exercised co-parenting time every other weekend and often kept the Child until Monday morning instead of returning him on Sunday. He claimed to enjoy a loving relationship with the Child and characterized his co-parenting time with the Child as "very significant." He asserted that the Child also enjoyed a great relationship with his extended family.

Father testified that he was currently employed with an annual salary of approximately $45,000 per year. He claimed that he was able to provide for the Child's needs. He regularly provided clothing for the Child, and he and his family assisted Mother on a regular basis in caring for the Child when she was unable. He opined that the Child often stayed with Mother's family or his family. He noted that the Child wore clothing that was often too little and soiled while in Mother's care. He claimed that the Child's hair was also disheveled and unbrushed. He asserted that he regularly remitted payment for the Child's medical expenses and that he maintained an insurance policy for

the Child. He agreed that his insurance policy changed from time to time but claimed that he always provided Mother with current proof of his insurance.

Father testified that his relationship with Mother was "very strained, very tense." He had very little interaction with her when exchanging the Child, and at times, she was "belligerent" and uncooperative when they interacted. He stated that Mother refused to communicate with him regarding the Child's educational and medical needs and that he often learned the Child was sick after the Child had already received treatment. He recalled taking the Child to the emergency room on one occasion after he retrieved the Child from Mother. He claimed that he heard Mother physically abuse the Child on one occasion and that he learned that she had spanked the Child on another occasion for talking about her to Father.

Father was concerned about Mother's proposed relocation because she had trouble maintaining employment for an extended period of time. He questioned the availability of family support when she had never mentioned the presence of any family in that area prior to her decision to relocate. He feared that the relocation would disrupt the Child's school relationships and those significant relationships already established with family, of both Mother and Father in Chattanooga.

Father feared that Mother would not encourage the Child to maintain a healthy relationship with him. He agreed that he often exercised co-parenting time beyond that which was required by the parenting plan but provided that her newly proposed parenting plan did not provide for the same amount of co-parenting time. He noted that exercising additional co-parenting time would be costly if she relocated. He claimed that she often interfered with his telephone conversations with the Child and that she refused his right to co-parenting time on at least two occasions.

Father acknowledged that Mother sought to obtain an order of protection against him and that he was arrested as a result of her allegations. He noted that he served less than 24 hours in jail and that he was never charged with an offense.

Father testified concerning numerous job postings in the area in Mother's field of employment. He noted that he found the postings in less than 30 minutes.

The paternal grandmother, Marsh Ella Lawrence, testified that she observed a loving relationship between the Child and Father. She provided that she visits with the Child when Father exercises co-parenting time. She explained that her side of the family meets every Sunday to visit. She related that Mother also asked her to care for the Child on occasion. She acknowledged that the relationship between Mother and Father was estranged but asserted that she never heard Father speak poorly of Mother. She agreed

that the Child often appeared "scruffy" when retrieved from daycare after being in Mother's care during the week.

The maternal grandmother, Sarah Broadnax, testified that her side of the family also gathers together on Sundays to visit and that she spends time with the Child on a weekly basis. She provided that Parents often exchange the Child at her residence. She stated that she observed a loving relationship between the Child and Mother and between the Child and Father. She recalled only one occasion in which Father was asked to leave her residence following the exchange of the Child. She related that she never observed either parent physically abusing the Child. She testified that she was excited for Mother's job opportunity and believed that it was in the Child's best interest to remain with Mother.

Shortly after the trial, Mother presented an affidavit with supportive documentation establishing that she had been offered a teaching position in Trenton, New Jersey, with an annual salary of $60,000. The court considered the evidence over Father's objection but then ultimately granted Father's petition, finding that the proposed relocation did not have a reasonable purpose. This timely appeal followed.

## II.    ISSUES

The parties raised a plethora of issues that we consolidate as follows:

A.    Whether the trial court erred in considering evidence of Mother's job offer after the close of the proof.

B.    Whether the trial court erred in finding that Mother's stated purpose for relocating was unreasonable pursuant to Tennessee Code Annotated section 36-6-108(d)(1)(A).

C.    Whether the trial court erred in granting the petition in opposition to the proposed relocation without conducting a best interest analysis pursuant to Tennessee Code Annotated section 36-6-108(e).

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995). "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decision.'" *Hyde v. Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV. DISCUSSION

### A.

Father argues that the trial court erred in considering evidence of Mother's job offer after the close of the proof. He notes that he did not have the opportunity to cross-examine Mother concerning the job offer and that some of the documents submitted to establish her offer were inadmissible hearsay documents.

Rulings on admissibility of evidence are within a trial court's discretion, and an appellate court will set aside such decisions "when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of evidence." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Likewise, "[p]ermitting additional proof, after a party has announced that proof is closed, is within the discretion of the trial court." *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)). "[U]nless it appears that its action in that regard has permitted injustice, its exercise of discretion will not be disturbed on appeal." *Id.*

We agree that the supportive documentation offered by Mother was inadmissible as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, she also attested in her affidavit that she had accepted an offer of employment in Trenton, New Jersey. This statement was admissible. Moreover, the

central issue of the case concerned whether the proposed relocation was for a reasonable purpose, namely Mother's anticipated employment in New Jersey. Father knew that Mother was awaiting notice of the outcome of her interview and diligently submitted proof in opposition to her proposed relocation if she were to receive a job offer. With these considerations in mind, we conclude that the trial court did not abuse its discretion in considering the fact that Mother had accepted an offer of employment in New Jersey as she attested in her affidavit.

B.

The parental relocation statute, codified at Tennessee Code Annotated section 36-6-108 governs this action. The statute creates a mechanism for determining whether a parent may relocate outside the state or more than 100 miles from the other parent within Tennessee. Parents agreed that they were not spending substantially equal intervals of time with the Child; thus, the issue at trial was whether Mother should be permitted to relocate with the Child pursuant to Tennessee Code Annotated section 36-6-108(d)(1), which provides:

> (d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:
>
>> (A) The relocation does not have a reasonable purpose;
>>
>> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or
>>
>> (C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code Ann. § 36-6-108(d)(1). The parent opposing the relocation bears the burden of proof to establish one of these three grounds. *Clark v. Clark*, No. M2002-03071-

COA-R3-CV, 2003 WL 23094000, at *3 (Tenn. Ct. App. Dec. 20, 2003). The relocation shall be permitted if the opposing parent fails to prove any of the three grounds. Tenn. Code Ann. § 36-6-108(d)(1). *If* the court finds one of the grounds to be present, then "the court shall determine whether or not to permit relocation of the child based on the best interest of the child." Tenn. Code Ann. § 36-6-108(e).

In this case, the trial court based its determination on whether the proposed relocation was for a reasonable purpose. In finding that the proposed relocation was not for a reasonable purpose, the court first cited the relevant statutory provisions and then stated,

> In this case, there is no evidence to show that the motive for relocation is intended to defeat or deter visitation rights, and the six subsections of section (2) with respect to serious and specific harm to the child are not implicated. Thus, the issue is whether relocation is reasonable.
>
> The most contested issue with respect to reasonableness is the job opportunity of [Mother]. Although [Mother] made initial requests for employment with the State of Tennessee and local governments, she made no efforts to obtain employment in the area for jobs paying $40,000 or less. One job for which application was made outside the geographic area of Chattanooga was to Scholar Academies whose headquarters are located in Philadelphia, Pennsylvania. Although the offer does not indicate it is for employment in Trenton, New Jersey, testimony of the [Mother] is that Trenton is the location. The offer was for a "10-month Position," and it did not indicate that there would be any possibility of renewal. Although, as indicated above, [Mother] testified that she has family in the area (New York and Washington, D.C.), she was noncommittal as to whether she has ever visited them. On the other hand, there is evidence that the family of both the mother and the father live in the geographic area of Chattanooga and that the grandparents spend significant amounts of time with their grandson.
>
> [Mother] testified that [the Child] would be placed in a private school for six months in Trenton in order to give [her] an opportunity to investigate the public school system of Trenton. Thus, no definite decision has been made with respect to his education in order to guide the Court. Under the circumstances, therefore, there is simply too much uncertainty associated with [Mother's] proposed move, and the Court cannot conclude that there is a reasonable basis for [the] move to Trenton, New Jersey.

Mother first questions the court's phrasing of the issue as whether the proposed relocation was reasonable. She notes that the pertinent issue at trial was whether the proposed relocation was for a reasonable purpose, not whether it was reasonable in general. A review of the order reveals that the court cited the relevant statutory provisions before determining that Tennessee Code Annotated section 36-6-108(d)(1)(A) was the only ground at issue. The court then determined that the proposed relocation was not for a reasonable purpose. This argument is without merit.

Next, Mother notes that the court erroneously stated that she had family in New York and Washington, D.C., when she testified that she had family in Pennsylvania, Massachusetts, and North Carolina. We agree that the trial court misstated her testimony; however, this misstatement had no bearing on the ultimate ruling when Mother never submitted proximity to family as a reason supporting her proposed relocation. This argument is without merit.

Finally, Mother argues that her proposed relocation was for a reasonable purpose as evidenced by two factors, namely an increase in pay and the opportunity for career advancement. She claims that any argument concerning the increased cost of living for her proposed relocation is offset by the fact that she did not have any job prospects in Chattanooga and the fact that her potential employment provides an increased earning potential that is unavailable in Tennessee. Father argues that the relocation was unreasonable when Mother did not perform an adequate search for employment opportunities in Tennessee and when the cost of living and lack of family support in New Jersey offset any increased earning potential.

"[D]eterminations concerning whether a proposed move has a reasonable purpose are fact-intensive and require a thorough examination of the unique circumstances of each case." *In re Spencer E.*, No. M2009-02572-COA-R3-CV, 2011 WL 295896, at *11 (Tenn. Ct. App. Jan. 20, 2011) (citation omitted). "[A]n increase in pay is but one of several economic factors that should be considered. Other relevant economic factors that are typically considered include, without limitation, the relative significance of the increase, the cost of living in the proposed location compared to the present location, the firmness of the job offer, opportunity for career advancement and economic betterment of the family unit." *Slaton v. Ray*, No. M2004-01809-COA-R3-CV, 2005 WL 2756076, at * 3 (Tenn. Ct. App. Oct. 24, 2005) (citing *Mitchell v. Mitchell*, No. M2004-00849-COA-R3-CV, 2005 WL 1521850, at *3 (Tenn. Ct. App. June 27, 2005)); *O'Bannon v. O'Bannon*, No. E2002-02553-COA-R3-CV, 2003 WL 22734673, at *2 (Tenn. Ct. App. Nov. 20, 2003)). Additionally, "the 'reasonable purpose' of the proposed relocation must be a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability 'to participate fully in their children's lives in a more meaningful way.'" *Webster v. Webster*, No. W2005-01288-COA-R3-CV, 2006 WL

- 10 -

3008019, at *14 (Tenn. Ct. App. Oct. 24, 2006) (quoting *Aaby v. Strange*, 924 S.W.2d 623, 631 (Tenn. 1996)).

Mother cited *Goddard v. Goddard*, No. E2011-00777-COA-R3-CV, 2012 WL 601183, at *8 (Tenn. Ct. App. Feb. 24, 2012) and *Butler v. Butler*, No. M2002-00347-COA-R3-CV, 2003 WL 367241, at *2 (Tenn. Ct. App. Feb. 20, 2003) in support of her position. In *Goddard*, this court upheld the trial court's ruling that the mother's proposed relocation had a reasonable purpose because it was based upon a number of factors, including her "financial condition, employment situation, family support and desire to relocate to Florida." 2012 WL 601183, at *8. In *Butler*, this court upheld the trial court's ruling that the mother's proposed relocation did not have a reasonable purpose when she offered nothing "except a belief and a hope that she can secure better employment." 2003 WL 367241, at *4. The court noted that "relocation because of a better job opportunity, greater salary, and career advancement opportunities, establishes a 'reasonable purpose' within the meaning of the statute" but that the proof offered did not "sustain the allegations of such increased salary and increased opportunities." *Id.* at *2.

Here, Mother did not claim that she was unable to pursue any employment opportunities in Tennessee. She merely claimed that she could not obtain a comparable salary in Tennessee. She does not account for what she admitted at trial was an increased cost of living in New Jersey as evidenced by the tuition for the Child's schooling and increased rent. Her testimony concerning the opportunity for career advancement is also unsubstantiated and subjective when considered with the fact that she only submitted "five or six" applications in Tennessee and the fact that her employment history has been largely unstable as evidenced by her employment at four different institutions in the past four years. Additionally, the record reflects that the Child enjoyed a loving relationship with Father and his extended family in Tennessee. With all of the above considerations in mind, we affirm the trial court's determination that Mother's purpose for relocating was unreasonable when weighed against the Child's loss of Father's ability to participate fully in his life.

C.

Mother argues that the trial court failed to conduct a best interest finding before granting Father's petition in opposition to her requested relocation. Father responds that the court implicitly found that the proposed relocation was not in the Child's best interest by granting his petition.

Once the trial court determined that Mother's purpose for relocating was unreasonable, it was then tasked with determining whether the proposed relocation was in

the best interest of the Child pursuant to Tennessee Code Annotated section 36-6-108(e), which provides as follows:

> *If* the court finds one (1) or more of the grounds designated in subsection (d), the court *shall* determine whether or not to permit relocation of the child based on the best interest of the child. If the court finds it is not in the best interests of the child to relocate as defined herein, but the parent with whom the child resides the majority of the time elects to relocate, the court shall consider all relevant factors including those factors found in § 36-6-106(a)(1)-(15).

(Emphasis added). In determining whether a proposed relocation is in the best interest of the Child, the court must consider the following factors:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

> (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

> (4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

> (5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

We agree that trial courts need not articulate each factor and its application to the case at hand.  However, the court must at least consider the factors to make a proper decision regarding the Child.  Our review of the court's order in this case reveals that the court failed to make a comprehensive best interest analysis.  Accordingly, we remand the matter for consideration of the appropriate factors in compliance with Tennessee Code Annotated section 36-6-108(e).

## V.    CONCLUSION

The judgment of the trial court is reversed.  We remand this case to the trial court for further proceedings consistent with this opinion and in compliance with Tennessee Code Annotated section 36-6-108(e).  Costs of the appeal are taxed one-half to the appellant, Jessica Marcel Broadnax, and one-half to the appellee, Quentin Elliott Lawrence.

_____
JOHN W. McCLARTY, JUDGE